UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| DWAYNE MOSLEY | § | C.A. NO.  2:16-cv-00107-JTM-KWR | |
| | § | | |
| VS. | § | | |
| | § | | |
| WOOD GROUP PSN, INC., ET AL | § | SEC "H" | MAG (4) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
WOOD GROUP'S MOTION FOR SUMMARY JUDGMENT**

NOW INTO COURT through undersigned counsel comes Plaintiff Dwayne Mosley

("Plaintiff" and/or "Mosley") and responds to the Motion for Summary Judgment filed by Defendant

Wood Group PSN, Inc. ("Wood Group") ("Motion", Rec. Doc. 94), which rests on two grounds: (1)

two of its payroll employees who worked on the platform with Plaintiff should be deemed

Fieldwood's borrowed employees, ostensibly depriving Plaintiff of claims against Wood Group, and

alternatively, (2) given that Fieldwood also considers Plaintiff its borrowed employee, Plaintiff

supposedly lacks any action against Jessie Villemarette, Daryl Trahan, or Wood Group under 33

U.S.C. §933(i) of the Longshore & Harbor Workers' Compensation Act ("LHWCA") which bars

claims against fellow employees such as Villemarette, Trahan and Wood Group. This Motion fails

on both counts: (1) Wood Group fails to conclusively prove its borrowed servant defense, and (2)

Plaintiff, Villemarette and Trahan are not Fieldwood's borrowed servants, but, even if they were,

Wood Group nonetheless remains vicariously liable for it workers' torts, such that if Villemarette

is found negligent, then Wood Group and Fieldwood remain solidarily and vicariously liable for

negligence.  See *Morgan v. ABC Manuf'r*, 710 So.2d 1077, 1083–84 (La. 1998).  In filing this

response, Plaintiff incorporates his contemporaneously filed Memorandum in Opposition to

Fieldwood's Motion for Summary Judgment.

I.      SUMMARY OF ARGUMENT

Copying Fieldwood's Motion (Rec. Doc. 91), Wood Group similarly seeks to avoid liability by claiming two of its payroll employees are Fieldwood's borrowed employees: Jessie Villemarette and Daryl Trahan.  As already shown by Plaintiff's Memorandum in Opposition to Fieldwood's Motion, neither Plaintiff nor Villemarette can be deemed Fieldwood's borrowed employee.  As shown herein, the evidence and authorities also preclude such a finding for Daryl Trahan.[1]

There are generally nine factors which courts consider in determining whether a person is a borrowed servant of a defendant, *i.e.*, an employee of a company other than his nominal employer. These are called the *Ruiz* factors, and certain elements are more important than others.  See *Washington v. Fieldwood Energy LLC*, 2017 WL 3264076, at \*4 (E.D. La. Aug. 1, 2017) (Milazzo, J.), in which this Court denied summary judgment on this issue ("all but factors one, two, and three weigh in favor of a borrowed employee finding. Factors one and three, however, present material issues of fact such that summary judgment would be inappropriate.").  Here, factors numbers one, two and three ('control,' 'whose work was being performed,'and 'understanding of the parties') and more all preclude summary  judgment.

Although Wood Group's Motion repeatedly claims that the workers received daily work assignments from Fieldwood, this Court has found a fact issues where lead operators "didn't have to tell" plaintiff what to do and that he "knew his job." *Washington*, 2017 WL 3264076, at \*3 (emphasis added, footnotes omitted). As production operators, Villemarette and Trahan were each specialists who needed no instruction from anyone; moreover, Fieldwood lacked the power to fire

---

[1] Plaintiff incorporates herein by reference his Memorandum in Opposition to Fieldwood's Motion for Summary Judgment which addresses Villemarette's relationship with Fieldwood, and devotes the instant response to showing why Daryl Trahan cannot be considered Fieldwood's borrowed employee.

them, and Fieldwood's supervisor –Frank Cornay– was rarely personally present on the rig, making

Fieldwood's argument that it so closely supervised and controlled these men's daily work

impossible. Most importantly, Villemarette's and Trahan's employer, Wood Group, contracted with

Fieldwood pursuant to an agreement which explicitly provided that the worker shall be, and perform

at all times, as an independent contractor not subject to Fieldwood's control.  While Wood Group

may claim the contracts were not followed, the contract's mere existence raises a fact issue as to the

"parties understanding" issue.  For these reasons, Wood Group's argument that Villemarette and

Trahan were Fieldwood's borrowed employees fails as a matter of law.

"The borrowed servant doctrine" is "an affirmative defense whereby a general employer

attempts to avoid liability for the actions of its employee by asserting the employee was loaned to

another employer." *Charpentier v. Marathon Oil Co.*, 162 F.3d 94, fn 1 (5th Cir. 1998).  A defendant

moving for summary judgment on an affirmative defense must prove that defense ***conclusively***.

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 193 (5th Cir. 2013);

*Williams v. Gusman*, 2015 WL 4875938, at *2 (E.D. La. Aug. 13, 2015); Fed. R. Civ. P. 56.  Wood

Group has not proven its affirmative defense and its motion must be denied. As this Court very

recently noted when denying Fieldwood summary judgment on a borrowed-servant issue, "A

determination of control and the parties' understanding is best left to the fact finder at trial.

Defendant's request for summary judgment on the borrowed employee issue is denied." *Washington*,

2017 WL 3264076, at *4.

In response to Wood Group's alterative argument, as shown in Plaintiff's Memorandum in

Opposition to Fieldwood's Motion, Mosley is not Fieldwood's borrowed servant and, in any event,

Wood Group nonetheless remains vicariously liable for Villemarette's torts under Louisiana law,

such that to the extent Wood Group's workers are found negligent, then Wood Group and Fieldwood remain solidarily and vicariously liable for such negligence under Louisiana law.  See *Morgan*, 710 So.2d at 1083–84, in which the Louisiana Supreme Court has found that an individual may simultaneously be the employee of *more than one employer* for the purposes of vicarious liability among the general and the special employers.

Wood Group is not entitled to summary judgment on either ground, and its Motion must be denied in its entirety.

## II.    MATERIAL FACTS

The facts show that neither Jessie Villemarette nor Daryl Trahan –both Wood Group's payroll employees– can be deemed Fieldwood's borrowed employees.

Mosley, a contract Production Operator employed by Quality Production Services (QPS), was injured on March 20, 2015, while working on Fieldwood's West Delta fixed platform when he slipped and fell on the main deck, landing on his back and hitting his head on the deck.

Mosley has sued the platform owner, Fieldwood, the operator Wood Group, and the electricians that disconnected the transformer, Linear Controls, Inc. and Linear Operating, Inc. ("Linear"). Rec. Doc. 40 (Plaintiff's Second Amended Complaint).

## III.    SUMMARY JUDGMENT EVIDENCE

Plaintiff accepts certain of Defendant's Statements of Uncontested Fact as set forth in his response thereto, and also relies upon the exhibits attached to Defendant's motion. In addition, Plaintiff relies on the following evidence attached hereto:

Ex. 1   Cornay deposition, testifying as Fieldwood's corporate representative

Ex. 2   Trahan deposition

Ex. 3   Plauche deposition

Plaintiff also incorporates by reference his Memorandum in Opposition Fieldwood's Motion for

Summary Judgment.

## IV.   ARGUMENT AND AUTHORITIES

Wood Group's Motion must be denied because neither Villemarette nor Trahan can be

deemed Fieldwood's borrowed employee.  As shown below, the nine-factor *Ruiz* test confirms that

Fieldwood lacks the degree of control necessary to be deemed both men's borrowing employer.

Plaintiff will address each of the two gentlemen at issue separately.

**A.    Application of the nine *Ruiz* factors establishes that Fieldwood cannot be Villemarette's borrowing employer.**

Plaintiff hereby incorporates by reference the relevant portion of his Memorandum in

Opposition to Fieldwood's Motion for Summary Judgment that shows Villemarette cannot be

considered Fieldwood's borrowed employee.

**B.    Application of the nine *Ruiz* factors establishes that Fieldwood cannot be Daryl Trahan's borrowing employer.**

As this Court recognized in *Washington v. Fieldwood Energy*, 2017 WL 3264076, the Fifth

Circuit uses the nine (9) factors that were first set forth in *Ruiz v. Shell Oil Co*., 413 F.2d 310, 312

(5th Cir. 1969), to determine borrowed employee questions.  Those nine factors are: (1) who has

control over the employee and the work he is performing, beyond mere suggestion of details or

cooperation; (2) whose work was being performed; (3) was there an agreement, understanding or

meeting of the minds between the original and the borrowing employer; (4) did the employee

acquiesce in the new work situation; (5) did the original employer terminate his relationship with the

employee; (6) who furnished the tools and the place for performance; (7) was the new employment

over a considerable length of time; (8) who had the right to discharge the employee; and, (9) who

had the obligation to pay the employee. *Billizon*, *v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir.), *reh'g*

*denied*, 3 F.3d 441 (5th  Cir. 1993), *Ruiz*, 413 F.2d at 312. "Whether borrowed-employee status

exists is a question of law but depends upon a fact-based inquiry, *Brown v. Union Oil Co. of*

*California*, 984 F.2d 674, 676–77 (5th Cir. 1993); therefore, factual disputes must be resolved before

the district court can make the necessary determination. *Hotard v. Devon Energy Production Co.*

*L.P.*, 308 Fed.Appx. 739, 741 (5th Cir. 2009)."  *Castille v. Apache Deepwater LLC*, 2017 WL

2814068, at \*3 (W.D. La. June 27, 2017).

To determine who has control over the employee, the court is required to distinguish

"'between authoritative direction and control, and mere suggestion as to details or the necessary

cooperation, where the work furnished is part of a larger undertaking.'" *Ruiz*, 413 F.2d at 313;

*Kindred v. Blake Int'l Holdings, L.L.C.*, 805 F.Supp.2d 278, 282 (E.D. La. 2011) (Lemmon, J.).

> **1.    There are genuine issues of material fact as to whether Fieldwood exercised control over Trahan in a manner which confers borrowed servant status.**

Wood Group was Trahan's payroll employer and part of its regular business was providing

specialist offshore operators to companies in the industry.[2]   Wood Group provided Trahan to

---

[2] Defendant's Ex. F (LeJeune deposition) at 82–83 (stating that Wood Group provides contract production operators to a number of oilfield companies. In each case it is the business of Wood Group to supply employees to work as directed and at the request of its customers).  Rec. Doc. 94–1 (Defendant Wood Group's Memorandum) at 4 ("Fieldwood had contracted with Wood Group to provide additional production operator personnel to Field wood's offshore platform. [Citing Ex. A, Master Service Agreement].  On the day of his alleged incident, there were three operators on the platform, plaintiff by way of QPS and two others supplied by Wood Group. The personnel on the platform were to abide by the master Service contracts between Fieldwood and their nominative employers and a letter Agreement regarding Fieldwood's "Safety and Environmental Management Systems (SEMS).").

Fieldwood to work as a production operator on Fieldwood's offshore platforms.[3] The contract-labor

nature of the relationship between Wood Group and Fieldwood militates against a finding of

control.[4] Additionally, Trahan's status as a specialist –*i.e.*, a production operator– meant he didn't

need to be told how to do his job.[5] Although the Defendant's Motion repeatedly claims that the

workers received daily work assignments from them, this Court has found a fact issues where the

lead operators "didn't have to tell" plaintiff what to do and that he "knew his job." *See Washington*,

2017 WL 3264076, at *3 (emphasis added, footnotes omitted).   In *Washington*, "Lead

operators…declared by affidavit that 'Plaintiff received his daily work assignments' from them.

Trahan testified at his deposition, however, that the lead operator's 'didn't have to tell' him what to

---

[3] LeJeune was Wood Group's operations manager at all pertinent times. Defendant's Ex. F (LeJeune deposition) at 67. Wood Group and Fieldwood had a contract to send production operators to Fieldwood's platforms on agreed rates and pursuant to a Master Services Agreement. Id. at 21; see also Defendant Wood Group's Statement of Uncontested Fact Nos. 89, 90.

[4] *See, e.g., Mathis v. Union Exploration Partners, Ltd.*, 1991 WL 42570, at *2 (E.D. La. Mar. 26, 1991), in which the denied summary judgment stating that there was a material issue of fact as to whether the platform's cook was under *Ruiz* control of the platform operator. In *Mathis*, the plaintiff was the only employee of his actual employer aboard the platform, and he argued that "he was able to perform his work independent from his employer at all times, essentially making him his own boss." He argued that any instructions from the platform operator were "mere suggestions." The *Mathis* court held that the control factor presented a fact issue which precluded summary judgment.

[5] Ex. 1 (deposition of Frank Cornay as Fieldwood corporate representative) at 27: 8–12. ("Q. Because that PIC who is employed on that platform, the WD 80D, has been sent out by Wood Group, and he's expected to do his job, and you don't have to tell him how to do his job, do you?   A. I shouldn't have to, no."). see Ex. 2 (Trahan deposition) at 34: 7–18 ("Q. Jessie wouldn't communicate with you? A. Jessie would not communicate. He would expect you to automatically know what's inside his mind.  Q. He left doing the details of your work to you; fair to say? I mean, he left you to do your work?   A. Yeah. He would let me go and keep myself busy.   Q. And you didn't have to rely on him to say, hey, Darrel, here's how you be a B operator? A. He never told me those words."). See Ex. 2 (Trahan deposition) at 42:14 – 43:12 ("Q.  And then you'd have a safety meeting, correct?   A.  Yeah, pretty -- it's not really a safety meeting, like how we are right here.  We'd just go downstairs, talk about what needs to be done for the day real quick and that's it. Q.  Who would kind of -- was it Jessie that took charge of those meetings? A.  Yes. Q.  And he ran the meetings? A.  Uh-huh.  Q.  And are there days out there when he just says, hey, go out and do your thing? A.  (Nods head.) *** Q.  Is that a yes? A.  Well, pretty much, the -- he would just say we do what we need to do and that's it.  I'd run -- do what I need to be done and I'd quit bothering him. Q.  Was there a huge -- not a huge difference day-to-day about what needed to be done, right?  A.  No, no.").

do and that he 'knew his job' and did not have to be supervised.[6] Accordingly, there is a material issue of fact as to whether Fieldwood gave Plaintiff daily work assignments or instructed him regarding his job.  Resolution of this fact is crucial to the determination of whether Fieldwood exercised the requisite control for Plaintiff to be considered its borrowed employee." *Washington*, 2017 WL 3264076, at *3.

Secondly, as shown fully immediately below in factor 3, the master service contract between Trahan's employer and Fieldwood expressly prevented Trahan from being considered Fieldwood's borrowed employee.  Even if Fieldwood claims that this contract was ignored or modified in practice (which Fieldwood has not proven, and which is expressly denied), the issue of the degree of the parties' adherence to the contract automatically raises a fact question as to the parties' understanding that precludes summary judgment.  *See Castille v. Apache Deepwater LLC*, 2017 WL 2814068, at *3 (W.D. La. June 27, 2017).

Thirdly, there was no Fieldwood supervisor who was consistently present on the platform who could physically exercise personal control over workers.  Frank Cornay –who is one of the few actual Fieldwood employees in Defendant's narrative– was not in verbal communication with the

---

[6]   Ex. 2 (Trahan deposition) 36:25– 37:5 ("Q.  But he wasn't supervising your work as a B operator?  A. No, no.  No, he wasn't.  Whenever I got on 80 Dog, he was not supervising my work.  Q.  And same thing with Mr. Cornay?  A.  Right."); 44: 10–20 ("A.  That was something I'd do on my own, not try to -- I'd make it a point to stay clear from Jessie as much as I could.  Q.  And on these rounds that you did like that, most of the time -- I mean, Jessie didn't tell  you, hey, go check that generator at 9:45?  A.  No.  He didn't have to, unless there's something that he wanted checked more often than normal because something's going on that he didn't fill us in about.  But other than that, no, I was pretty much -- I did my thing."). See Ex. 3 (Plauche deposition) 52:2–10 ("Q.  And these are guys that you expect you can put out there on a platform who can do the job safely because they're experienced at doing the job, correct?  A.  That's right.  Q.  And you don't have to tell them which way  to turn screws and which valve to turn and all of that; that's why you hire experts, right?  A.  That's right."); Ex. 2 (Trahan deposition) 32: 25 –33:14 ("I mean, you know how to do that job?  A.  Uh-huh.  Q.  Is that a yes?  A.  Yes, yes.  Q.  You don't need someone to tell you how to do that basic B operator stuff, do you?  A.  No.  Unless I'm on a platform that I'd never been to before, until I get familiar with where everything is and how everything is working.  But other than that, no, because every platform    operates different.  Q.  Right.  But that wasn't the case with 80 Dog?  A.  No, no.").

two PICs each day; rather, he would merely be in e-mail contact with them each day.[7]  Each PIC

would have to fill out the morning report and production numbers at 5:30 in the morning each day

and it was the ultimate responsibility of each PIC to ensure that the morning report was correct and

sent to Mr. Cornay.[8] Indeed, Wood Group's motion (Rec. Doc. 94–1 at 4) admits, "On the day of his

alleged incident, there were three operators on the platform, plaintiff by way of QPS and two others

supplied by Wood Group."  meaning no Fieldwood PIC was present.  This reality directly conflicts

with Defendant's assertion that "the day-to-day activities were directed by the Fieldwood field

supervisor, Frank Cornay."[9]  Presented with a similar of lack of direct supervision from Fieldwood,

this Court recently found that a fact issue existed as to a cook's borrowed employee status:

> Plaintiff worked as a cook on Fieldwood's platform preparing food for its workers,
> doing laundry, and cleaning the living quarters. Plaintiff was the only employee from
> Taylors on the platform. ***Plaintiff performed his duties without much instruction
> and largely went unsupervised***. He stuck to a specific set schedule of cleaning and
> cooking, which he had performed aboard platform VR 272A since even before
> Fieldwood acquired ownership of it. He selected the menu and decided what to cook
> on any given day but often asked for requests from Fieldwood personnel.
> Occasionally, the time that he served dinner was subject to change depending on the
> schedules of the Fieldwood employees.

*Washington*, 2017 WL 3264076, at *2 (emphasis added).  After having discussed the result in

*Robertson v. W&T Offshore, Inc.*, 712 F.Supp.2d 515 (W.D. La. 2010), in which the district court

---

[7]  Defendant's Statement of Uncontested Fact No. 86 ("86. Although Mr. Cornay was located on another platform, he was in e-mail and reporting contact with Mr. Villemarette on a daily basis. (Cornay depo., p. 103.)").

[8]  Defendant's Ex. F (Cornay depositon) at 104:  2–10.  Ex. 1 (Cornay deposition, testifying as Fieldwood's corporate representative) at 27: 3– 15.

[9]  See Ex. 2 (Trahan deposition) at 35:10 to 35:24 (Q.   Did you ever speak to a guy named Frank Cornay?  A.   He was a foreman?   Q.   Yeah.   A.   The last time that I was on 79 platform,  he was staying over there, but I -- me and him wasn't like, buddy buddy or anything like that, talking every break we got.   Q.   Did you ever talk to him while you were on 80 Dog?    A.   No.   Q.   Did you talk to any Fieldwood people while you were on 80 Dog?   A.   Just Shawn maybe once or twice, but other than that, that was it.")

found that a cook on a platform was a borrowed employee and that the plaintiff took instruction and

orders from the borrowing employer, this Court observed:

> . . . the court reached a different result, however, in *Mathis v. Union Exploration Partners, Ltd.*, [1991 WL 42570, at \*2 (E.D. La. Mar. 26, 1991)],in which a court in the Eastern District of Louisiana denied summary judgment stating that there was a material issue of fact as to whether the platform's cook was under *Ruiz* control of the platform operator.  In that matter, the plaintiff was the only employee of his actual employer aboard the platform, and he argued that "he was able to perform his work independent from his employer at all times, essentially making him his own boss." He argued that any instructions from the platform operator were "mere suggestions." The court held that the control factor presented a factual issue which precluded summary judgment.
>
> The Court finds that the facts presented here are more in line with *Mathis*. Here, there is an issue of material fact as to whether Fieldwood personnel supervised Plaintiff. The lead operators at Fieldwood, James Pena and John Teer, declared by affidavit that Plaintiff "received his daily work instructions and assignments" from them. Plaintiff testified at his deposition, however, that the lead operators "didn't have to tell" him what to do and that he "knew his job." Accordingly, there is a material issue of fact as to whether Fieldwood gave Plaintiff daily work assignments or instructed him regarding his job. ***Resolution of this fact issue is crucial to a determination of whether Fieldwood exercised the requisite control for Plaintiff to be considered its borrowed employee.***

*Washington*, 2017 WL 3264076, at \*3 (emphasis added, footnotes omitted).

Moreover, the instances of "control" cited by Wood Group are simply examples related to

Fieldwood being the platform owner and thus taking the direction required to control all activities

thereon:

> Ultimately, the record indicates that [plaintiff] Castille was Total Safety's fire/safety technician sent to work on Apache's platforms. The examples cited by Apache as "control" factors are merely examples related to Apache being the owner of the platforms and the direction required to control the work on the platforms. Accordingly, the factual determination of who controlled Castille's work should be decided by the fact-finder unless the other factors overwhelmingly support Castille's borrowed employee status.

*Castille*, 2017 WL 2814068, at *5.  Moreover, Trahan testified that some of the work performed by

Jessie Villemarette was not necessary to his work.[10]

At very least, there is a fact issue as to the issue of "control," which courts indicate is one of

the more important factors in the *Ruiz* analysis.  "Resolution of this fact issue is crucial to a

determination of whether Fieldwood exercised the requisite control for Plaintiff to be considered its

borrowed employee." *Washington*, 2017 WL 3264076, at *3.  "No single factor, or combination of

them, is determinative; although, in a number of prior cases, the Fifth Circuit has considered the first

factor—control—to be the central factor. *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th

Cir. 1988), *Capps v. N.L. Baroid–NL Indus., Inc.*, 784 F.2d 615, 616–17 (5th Cir. 1986)." *Castille*,

2017 WL 2814068, at *3.

### 2.    Trahan was performing his employer's (Wood Group's) work –not Fieldwood's– on the platform.

Like Mosley and Villemarette, Trahan was a specialist who was provided by a labor-

contracting concern whose business it as to provide qualified production operators to companies

such as Fieldwood.[11]  He was not an unskilled roustabout who was only supposed to work under

direct supervision; rather, Trahan was a trained professional.  He was thus performing Wood

---

[10]  See Ex. 2 (Trahan deposition) at 41:10-25   ("Q.  Making a name for himself by – By constantly messing with stuff to make things better.  In his mind, that's what he's doing.   Q.  Kind of taking the initiative on things?   A.  Uh-huh.  But he would mess with stuff that  you wouldn't want to mess with.  They got -- I remember they had one of those wells on that platform that would take a long time to bring back up.  You don't want to mess with nothing.  If that
thing's Cadillac, just leave it be.  Let everything go, write down your round numbers and that's it.
No, he's constantly tinkering with stuff.  Q.  He's out there doing things that don't need to be done?  A.  Right. And that's why I kind of kept a  distance from him.  I'd do my own thing.").

[11]  Defendant Fieldwood's Additional Uncontested Fact No. 2. ("2.  As concerns production operators, Wood Group supplies employees to work as directed and at the request of its customers.").  Defendant Wood Group's statement of Uncontested Fact No. 90 ("90. Mr. LeJeune agreed that Wood Group and Fieldwood had a contract to send production operators to Fieldwood's platforms on agreed rates and pursuant to a Master Services Agreement.").

Group's work on Fieldwood's platform. *Washington*, 2017 WL 3264076, at \*4 (emphasis

added).  Alternatively, he was performing both Wood Group's and Fieldwood's work.  *Castille,*

2017 WL 2814068, at \*5 (emphasis added). Either way, the second *Ruiz* element, the 'Who's

Work?' element, doesn't favor Fieldwood.

> **3.    The contract between Trahan's employer and Fieldwood raises a fact issue as to whether Fieldwood could ever control Trahan or consider him its borrowed employee**.

As with Villemarette, Wood Group provided Trahan to work on Fieldwood's platform

pursuant to a Master Service Contract, of which provides: "[Wood Group] shall be, and perform

at all times, as an independent contractor; and neither [Wood Group] nor any member of [the

Wood Group Group] shall be deemed to be subject to the control or direction of [Fieldwood] as

to the details of the Work.[12]  The Fifth Circuit has held that a contract provision declaring that a

plaintiff was not an employee of the alleged borrowing employer, when considered with other

facts, can preclude summary judgment. *West*, 765 F.2d at 531; *Vincent*, 2015 WL 6758269, at \*3.

"In deciding this factor, courts have looked to contractual provisions and the behavior of the

parties to determine whether an understanding existed.*"  Posey*, 2016 WL 3430545, at \*6*;*

*LeBlanc*, 946 F.Supp.2d at 551. "The Fifth Circuit has held that such contract language creates an

issue of fact as to the third factor, such that summary judgment would be appropriate only when

---

[12]   Defendant Fieldwood's Statement of Uncontested Fact Nos. 98, 99 ("98. Wood Group provided Mr. Villemarette to work as directed by Fieldwood pursuant to a Master Service Contract (hereafter the "Wood Group Contract.") (Wood Group depo., p. 22; Wood Group Contract, a copy of which is attached as Exhibit G.)  99. Section 7 of the Wood Group Contract provides: "[Wood Group] shall be, and perform at all times, as an independent contractor; and neither [Wood Group] nor any member of [the Wood Group Group] shall be deemed to be subject to the control or direction of [Fieldwood] as to the details of the Work." (Wood Group Contract, § 7.)."). Defendant Wood Group's statement of Uncontested Fact No. 90 ("90. Mr. LeJeune agreed that Wood Group and Fieldwood had a contract to send production operators to Fieldwood's platforms on agreed rates and pursuant to a Master Services Agreement.").

"the remaining factors clearly point to borrowed-employee status." *Washington*, 2017 WL

3264076, at *4.

It is anticipated that Fieldwood may argue or suggest that the undisputed terms of the master

service agreement are not important because, allegedly, the parties didn't always follow the

contract.[13] As noted by a sister court,

> Notwithstanding the express language of the MSA, courts have found that contract
> provisions similar to the one at issue here do not prohibit a finding of borrowed
> servant status where the workplace realities are otherwise. In *Brown v. Union Oil Co.
> Of California*, 984 F.2d 674, 677 (5th Cir. 1993), the Fifth Circuit found that such
> contract provisions do not automatically prevent borrowed employee status from
> arising because the parties' actions in carrying out the contract can impliedly modify
> or waive the express provision. ***The Court held that conflicting evidence regarding
> whether the parties impliedly modified the contract raised a factual dispute that
> should be determined by a fact-finder***. Id. at 678.

*Castille,* 2017 WL 2814068, at *5 (emphasis added).  As the court in *Castill*e concluded,  "The

Court finds that a factual dispute concerning the third factor exists in this case." *Id.*

The mere existence of the contractual prohibition against borrowed servant status is sufficient

to defeat summary judgment on the borrowed servant issue, even if many of the other issues point

in Fieldwood's favor. *Washington*, 2017 WL 3264076, at *4.

**4.      There was no "new work situation" for Trahan to acquiesce to.**

Because Trahan, a production operator, was working as a production specialist, he was

performing his employer's work on Fieldwood's platform.  *See Washington*, 2017 WL 3264076,

---

[13] It should be noted that Joel Plauche testified that the contract meant what it said. Ex. 3 (Plauche deposition) at 58:8–23 (" Q.   But in this one, in paragraph 7, sometimes you just -- they become then, what, employees?  A.   No, they're not employees.   Q.   So if he's not an employee, he's still a contractor?   A.   He's the contractor.   Q.   And Fieldwood is not supposed to be  controlling or directing the contractor?  ***   Q.   Details of the work, right?  A.   I guess it's -- it's not so much the direct specific step-by-step job task that Fieldwood  is directing this individual to do. Okay?  That's the employee responsibility . . . .").

at *4.  There was no "new work situation" for him to acquiesce with.  He was simply performing the

job that Wood Group hired him to perform for its customer.

> **5.     Wood Group never terminated its role as Trahan's employer when he worked on Fieldwood's platform.  On the contrary, Trahan always remained on Wood Group's payroll.**

Here, no one claims that Wood Group somehow severed its employment relationship with

Trahan, and it is clear that Mr. Trahan was paid at all times by Wood Group.[14]  Fieldwood merely

contends that Wood Group's relationship with Trahan (and Villemarette) grew attenuated due to his

working offshore, well away from Wood Group headquarters, and on another entity's facility, so that

the other entity somehow became his borrowing employer.  Courts have rejected such reasoning.  See

*Castille*, 2017 WL 2814068, at *5–6 (record citations omitted).

> **6.     Furnishing of tools and place of employment.**

Wood Group does not specifically address this issue with respect to Trahan.  Instead, it

addresses this issue solely with respect to Villamarette.  Memo at p. 20 (Rec. Doc. 94-1).  As

shown in Plaintiff's Memorandum in Opposition to Fieldwood's Motion with respect to

Villemarette, in addressing similar arguments, district courts have found a question of fact arises,

preventing summary judgment on the borrowed employee issue:

> Apache furnished Castille with the place of employment, meals, lodging, and transportation to and from work. Total Safety provided Castille with most of the tools he needed on the job. When Castille needed assistance with parts and equipment, plaintiff would check in with Dronet, his Total Safety supervisor. The Court finds the facts in this case are more similar to those in *McCarty v. Vastar Resources, Inc.*, 2002 WL 1837918, at *5 (E.D. La.,2002) ("Vascar [the platform owner] furnished plaintiff with the place of employment, meals, lodging, and

---

[14] Defendant's Statement of Uncontested Fact No. 77.  ("77.  ***At all times***, Jessie Villemarette was a payroll employee of Wood Group. (Deposition of Wood Group PSN, Inc., hereafter "Wood Group depo.", p. 85.")(emphasis added).

transportation to and from work. American Aero [plaintiff's employer] provided plaintiff with most of the tools he needed on the job."). The Court concludes that this factor is neutral.

*Castille*, 2017 WL 2814068, at *6 (record citations omitted).  *See further West*, 765 F.2d at 531

("Even though Kerr-McGee supplied West's tools and had the power to control his actions

during his five months on platform 229–A, we hold that . . . enough conflicting evidence has

been surfaced to make summary judgment for the defense inappropriate.").

> **7.      At the time of Mosley's accident, Trahan had been working on the Fieldwood platform for several months**

At the time of Mosley's accident, Trahan had been working on Fieldwood's WD 80-D for

a few months.   Defendant does not argue or show that this is a comparatively long period of time.

Defendant has not proven this element.

> **8.      As payroll employer, only Wood Group had the right to discharge Trahan;  Fieldwood could only request that Wood Group remove Trahan from the WD 80-D.**

Mr. Cornay, Fieldwood's foreman, admitted that he could not terminate Wood Group

employees' employment with Wood Group, only have them removed from Fieldwood structures.[15]

Having someone removed from a worksite is different from terminating his relationship with his

employer. Put simply, Fieldwood lacked any right to fire Trahan, Villemarette or Plaintiff.  This

factor militates strongly against any finding of borrowed employee status.

> **9.      As Trahan's payroll employer, Wood Group paid and was responsible for paying Trahan. Wood Group wrote the paychecks.  Fieldwood could only verify the amount of time reflected on Trahan's timesheets.**

---

[15]   Defendant Wood Group's Statement of Uncontested Material Fact No. 60.  ("60. Mr. Cornay admitted that he could not terminate Mr. Mosley or Mr. Villemarette's employment with their nominative employer. . ."). Ex. 1 (Cornay as representative deposition) at 36.

Wood Group workers including Villemarette and Trahan completed time tickets for the hours that they worked for Fieldwood on WD 80-D and submitted weekly time sheets to Frank Cornay for his approval. If Fieldwood did not approve the weekly time sheet, the worker would not be paid by Wood Group. The amount of paychecks *from Wood Group* was based on the number of hours that Fieldwood had approved.[16] This factor militates strongly against any finding of borrowed employee status and establishes that Villemarette and Trahan were and remained Wood Group's employees.

### C.      Wood Group's alternative argument lacks merit

Finally, Wood Group contends that "If the Court finds that Mosley, Trahan and Villemarette are Fieldwood's borrowed employees, then alternatively, Mosley has no cause of action for the alleged negligence of Villemarette and/ or Trahan (which negligence is denied) under § 933(i) of the LHWCA, because they are co-employees. Though the dismissal of Wood Group is not contingent upon the granting of Fieldwood's Motion, Wood Group submits that §933 (i) of the LHWCA further warrants the dismissal of Mosley's claims." Rec. Doc. 94-1 (Memo) at 20.  This is Wood Group's entire argument and briefing in this regard.

As shown in Plaintiff's Memorandum in Opposition to Fieldwood's Motion, however, Plaintiff cannot be deemed Fieldwood's borrowed servant and, in any event, Wood Group nonetheless remains vicariously liable for Villemarette's torts under Louisiana law, such that to the extent Villemarette is found negligent, then Wood Group and Fieldwood are solidarily and vicariously liable for such negligence.  See *Morgan*, 710 So.2d at 1083–84, in which the Louisiana

---

[16] Defendant Fieldwood's Statement of Uncontested Fact Nos. 122–125 (emphasis added). Fieldwood's Memorandum concedes this point at p. 25: "The undisputed facts show that both completed time tickets for the hours that they worked for Fieldwood on WD 80-D. The time tickets would be submitted to Fieldwood's Frank Cornay for review and approval. If the time tickets were not approved, *they would not be paid by their payroll employers*. The paychecks of Messrs. Villemarette and Mosley were based on the number of hours that Fieldwood approved they had worked." (Emphasis added).

Supreme Court found that an individual may simultaneously be the employee of more than one employer for the purposes of vicarious liability among the general and the special employers. Thus a general employer that was in business of hiring its employees out to work for others remained liable for "borrowed" employee's torts. *Id.* As noted in *Barthelemy v. Phillips Petroleum Co.*, 1999 WL 65024, at *6 (E.D. La. Feb. 9, 1999), " In Morgan, the Louisiana Supreme Court noted the problems with the "borrowed servant doctrine". The Court outlined the problems of applying either the "right of control" test or the "whose business" test and the inconsistent results even in factually parallel situations. *Morgan,* 710 So.2d at 1081. The *Morgan* Court also noted the policy problems of allowing these "general employers" the benefits of tort immunity. Consequently, the *Morgan* Court held both the general employer and the special employer solidarily liable for the torts of an employee." 1999 WL 65024, at *6 . Wood Group's Motion runs afoul of *Morgan*.

Wood Group is not entitled to summary judgment on either the borrowed employee or the co-employee argument, and its Motion must be denied.

## V.    CONCLUSION

As seen above, Wood Group cannot immunize itself from tort liability because it cannot conclusively prove that its employees, Villemarette and Trahan, were Fieldwood's borrowed employees. Both always remained Wood Group's payroll employees, and as specialist production operators who were retained on an independent contractor basis, they needed no instruction from anyone on how to perform their jobs. Fieldwood lacked the power to fire them and Fieldwood's supervisor on the rig –Frank Cornay– was rarely personally present, undermining the argument that Fieldwood somehow controlled their day-to-day work. Most importantly, the men's respective employers contracted with Fieldwood explicitly providing that the worker shall be, and perform at

all times, as an independent contractor not subject to Fieldwood's control, thus automatically raising

a fact issue on the control issue sufficient to defeat a motion for summary judgment.  As this Court

very recently noted when denying Fieldwood summary judgment on a borrowed-servant issue, "A

determination of control and the parties' understanding is best left to the fact finder at trial.

Defendant's request for summary judgment on the borrowed employee issue is denied." *Washington*,

2017 WL 3264076, at *4.

For all these reasons, Wood Group's argument that Villemarette and Trahan were its

borrowed employees fails, and its Motion for Summary Judgment should be denied.  Similarly, its

alternative argument about the co-employee prohibition of liability is supported by neither the facts

nor Louisiana law.

WHEREFORE, Plaintiff prays the Court deny Defendant's Motion, and for all further relief

to which he may be justly entitled.

Respectfully submitted,

*/s/ Marcus R. Spagnoletti*
Marcus R. Spagnoletti (PHV)
Texas Bar No. 24076708
marcus@spaglaw.com
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone:     713-653-5600
Facsimile:     713-653-5656

**OF COUNSEL**:

SPAGNOLETTI & CO.
Mary Holmesly (PHV)
Texas State Bar No. 24057907
mholmesly@spaglaw.com
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone:      713-653-5600
Facsimile:      713-653-5656

Walter Naquin, Jr. (09891)
butchnaquin@bellsouth.net
P.O. Box 127
Thibodaux, LA 70302
Telephone: 985.447.9554
Facsimile: 985.447.9550

Ryan R C. Hicks (PHV)
TX State Bar No.  24008896
rhicks@schneiderwallace.com
3700 Buffalo Speedway Ste 300
Houston, TX 77098
Telephone:      713-338-2560

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing was on this 19th day of September, 2017, automatically accomplished on all counsel of record through the Notice of Electronic Filing (CM/ECF system), in accordance with the Federal Rules of Civil Procedure.

> */s/ Marcus R. Spagnoletti*
> Marcus R. Spagnoletti