UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DWAYNE MOSLEY                                    CIVIL ACTION

VERSUS                                           NO: 16-107

WOOD GROUP, PSN INC. ET AL.                      SECTION: "H"(1)

## ORDER AND REASONS

Before the Court are Defendant Wood Group PSN Inc.'s Motion for Summary Judgment (Doc. 94), Defendant Fieldwood Energy LLC's Motion for Summary Judgment (Doc. 91), and Defendants Linear Controls, Inc. and Linear Controls Operating, Inc.'s Motion for Summary Judgment (Doc. 92). For the following reasons, the Motions are GRANTED.

## BACKGROUND

Plaintiff Dwayne Mosley alleges that he sustained a back injury when he slipped and fell in hydraulic fluid on the deck of the fixed platform on which he was working. Specifically, he contends that while a transformer was being

1

moved, it was damaged and began to leak hydraulic fluid. The leak was initially contained in a bucket, but later, an employee of Defendant Wood Group, Daryl Trahan, opened the spigot on the transformer and allowed hydraulic fluid to run out onto the deck. Trahan attempted to wash the fluid into a sump drain with a water hose. Trahan was thereafter reprimanded and instructed to clean the area with soap. The next morning, Plaintiff slipped and fell while walking through the area. Plaintiff brought suit against Wood Group PSN, Inc. ("Wood Group") and Fieldwood Energy LLC ("Fieldwood"), the owners and/or operators of the platform, as well as Linear Controls, Inc. and Linear Controls Operating, Inc.'s (collectively, "Linear Controls") for their negligence in moving the transformer.

Each Defendant has filed a separate motion for summary judgment seeking dismissal of the claims against it. Fieldwood argues that Mosley is its borrowed employee and therefore his exclusive remedy lies in the Longshoremen and Harbor Workers' Compensation Act ("LHWCA") and his tort claims against it cannot prevail. Wood Group alleges that both Jessie Villemarette, Mosley's supervisor, and Trahan are also borrowed employees of Fieldwood, and it therefore cannot be vicariously liable for their negligence. Finally, Linear Controls argues that it cannot be liable for Mosley's injuries because (1) Trahan's negligence was a superseding event, and (2) the hazard was open and obvious. This Court will consider each argument in turn.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[3] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[4] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[5] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[6] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the

---

[1] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[2] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[3] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).
[4] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[5] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[6] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

necessary facts."[7] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[8]

## LAW AND ANALYSIS

### I. Fieldwood's and Wood Group's Motions for Summary Judgment

Fieldwood argues that Plaintiff was the borrowed employee of Fieldwood and therefore his excusive remedy lies in the LHWCA, applicable by virtue of OCSLA. It argues that under the LHWCA, Plaintiff cannot bring a tort claim against Fieldwood if it is his borrowed employer and his negligence claims must therefore be dismissed. Defendant concedes, however, that in order for Plaintiff to be a borrowed employee of Fieldwood, his supervisor Jessie Villemarette, a payroll employee of Wood Group, must also be a borrowed employee of Fieldwood.

Wood Group also argues that Villemarette and Daryl Trahan, its payroll employees, are the borrowed employees of Fieldwood, and it therefore cannot be vicariously liable for their actions. It also points out that if all three men are deemed to be the borrowed employees of Fieldwood, then Mosley cannot assert a cause of action against his co-employees under 33 U.S.C. § 933 of the LHWCA.

---

[7] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[8] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

Whether an individual qualifies as a "borrowed employee" is an issue of law determined by nine separate factors first delineated by the Fifth Circuit in *Ruiz v. Shell Oil Co.* The factors are:

(1) who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation;

(2) whose work is being performed;

(3) was there an agreement, understanding or meeting of the minds between the original and the borrowing employer;

(4) did the employee acquiesce in the new work situation;

(5) did the original employer terminate his relationship with the employee;

(6) who furnished tools and place for performance;

(7) was the new employment over a considerable length of time;

(8) who had the right to discharge the employee;

(9) who had the obligation to pay the employee.[9]

No single factor or set of factors is determinative in establishing a "borrowed employee" relationship, however the central factor is that of control.[10] The party asserting the borrowed servant relationship, has the burden of proving the relationship.[11] This Court will consider these factors as they relate to Villemarette, Mosley, and Trahan in turn.

---

[9] *See* Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir. 1969).
[10] Brown v. Union Oil Co. of Calif., 984 F.2d 674, 676 (5th Cir. 1993).
[11] Franks v. Assoc'd Air Center, Inc., 663 F.2d 583, 587 (5th Cir. 1991).

### A. Control

"In considering whether the power exists to control and direct a servant, a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking."[12] Defendants contend that it is the business of Wood Group to supply production operators to work as directed by its customers. They contend that Wood Group supplied Villemarette to Fieldwood to work under its control as Fieldwood's Person-in-Charge ("PIC") on the platform WD 80-D. Villemarette's duties included supervising the other operators and leading the safety meeting. Defendants contend that all of his instructions and orders came from Frank Cornay, Fieldwood's production foreman and that Fieldwood was responsible for Villemarette's work schedule.

Mosley was provided to Fieldwood by QPS, whose business is to provide qualified production operators to its customers. Mosley worked as a skilled production operator. Fieldwood selected which platform Mosley worked on and determined his schedule. Mosley reported directly to Villemarette and received his daily work instructions from Villemarette, which included cleaning, preparing reports, maintenance, and repairs. Mosley also performed rounds every hour checking and inspecting the fuel lines, pumps, tubing, and compressor etc. Mosley testified that he did not receive assignments from QPS while aboard the platform and that his only contact with QPS concerned his

---

[12] *Ruiz*, 413 F.2d at 313 (internal quotations omitted).

time sheets. Mosley was the only individual on the WD 80-D associated with QPS.

Trahan was provided by Wood Group to work as a production operator on Fieldwood's platforms. Trahan also reported to and received instructions from Villemarette. He testified that he attended daily safety meetings at which they discussed the job tasks for the day. His responsibilities included inspecting different parts of the platform, ensuring everything was running properly, and making repairs as needed.

Plaintiff argues that Fieldwood did not have control over Villemarette, Mosley, and Trahan because they were specialists or skilled workers who did not need to be told how to perform their jobs. He argues that each knew how to perform the functions of their positions and did not need to be supervised. Plaintiff also argues that Cornay only communicated with Villemarette via email and that there was not a Fieldwood representative in physical or verbal contact with Villemarette on a daily basis.

In making these arguments, Plaintiff relies heavily on this Court's prior opinion in *Washington v. Fieldwood Energy*, in which this Court held that there was a material issue of fact as to the control factor when the plaintiff testified that "the lead operators 'didn't have to tell' him what to do and that he 'knew his job.'"[13] However, the Court finds this case distinguishable. In *Washington*, the Plaintiff was a cook aboard the platform who "performed his duties without much instruction and largely went unsupervised."[14] The plaintiff "stuck to a

---

[13] Washington v. Fieldwood Energy LLC, No. 15-6615, 2017 WL 3264076, at *3 (E.D. La. Aug. 1, 2017).
[14] *Id.*

specific set schedule of cleaning and cooking, which he had performed aboard platform VR 272A since even before Fieldwood acquired ownership of it. He selected the menu and decided what to cook on any given day but often asked for requests from Fieldwood personnel."[15]

Here, there is no indication that Villemarette, Mosley, or Trahan "largely went unsupervised." Indeed, Cornay testified that every PIC, like Villemarette, communicated with him at least twice a day and that he advised them of any activity that would be taking place on their platform. Another Fieldwood representative testified that a PIC's "overall work and responsibility" comes from Fieldwood. The representative explained that a PIC is different from other contractors because they are brought on to perform day-to-day activities and not just one specific job. Mosley testified that he received all of his daily work instructions from Villemarette. Finally, Trahan testified that they discussed their job tasks at the morning safety meeting, that he sometimes asked Villemarette for tasks, that Villemarette occasionally taught him how to do things, and that everything had to be done Villemarette's way. This evidence does not suggest that the employees were unsupervised or self-sufficient. It suggests that they were under the control of Fieldwood. "This Court has held that close supervision of skilled employees is not necessary to establish control."[16] Instead, it is sufficient that, to the extent that the employees were supervised, they were supervised by Fieldwood, not Wood

---

[15] *Id.*

[16] Ramsey v. Chevron U.S.A., Inc., No. 87-619, 1988 WL 2688, at *1 (E.D. La. Jan. 14, 1988). The Court notes, however, that Plaintiff has not put forth any argument or evidence establishing that Villemarette, Mosley, or Trahan are skilled workers.

Group or QPS.[17] Accordingly, this factor weighs in favor of a borrowed employee finding.

**B. Work Performed**

Fieldwood argues that Villemarette, Mosley, and Trahan were performing its work on the WD 80-D because they assisted Fieldwood in the production of oil and gas. Plaintiff contests that their work was as specialists or trained professionals provided by Wood Group or QPS and therefore they performed Wood Group's or QPS's work. This Court wholly disagrees. Despite the fact that these production operators may have had certain skills and training when they were assigned to work aboard a Fieldwood platform, they were indisputably doing Fieldwood's work by assisting it in the production of oil and gas.[18] Wood Group's and QPS's work is merely to provide qualified employees to businesses like Fieldwood. This factor weighs in favor of a borrowed employee finding.

**C. Agreement or Understanding**

Wood Group provided Villemarette and Trahan to work for Fieldwood pursuant to a Master Service Contract ("MSC"). It provided that Wood Group "shall be, and perform at all times, as an independent contractor" and neither Wood Group nor its employees "shall be deemed to be subject to the control or direction of [Fieldwood] as to the details of the Work." QPS provided Mosley to work for Fieldwood pursuant to an MSC containing an identical provision. Accordingly, it appears that the parties attempted to contractually prevent a

---

[17] *Id.*; *see* Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1245 (5th Cir. 1988).
[18] *Melancon*, 834 F.2d at 1245 ("Melancon's work assisted Amoco in the production of hydrocarbons by maintaining the production equipment and platforms in the Amoco field.").

9

borrowed employee finding. "The reality at the worksite and the parties' actions in carrying out a contract, however, can impliedly modify, alter, or waive express contract provisions."[19] The Fifth Circuit has held that such contract language creates an issue of fact as to the third factor, such that summary judgment would be appropriate only when "the remaining factors clearly point to borrowed-employee status."[20]

In addition, Defendants point out another provision of the MSCs that required Wood Group and QPS to endorse their insurance policies to include a borrowed servant endorsement. Defendants argue that this is proof that the parties contemplated that Wood Group's or QPS's employees might become borrowed employees of Fieldwood. In light of the foregoing, there are material issues of fact as to the agreement or understanding between Fieldwood and Wood Group and Fieldwood and QPS.

### D. Acquiescence

"The focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them."[21] Each of the employees worked aboard the WD 80-D for several months prior to Mosley's accident and nothing suggests that they did not acquiesce to their working situations. A few months is a sufficient amount of time to appreciate and acquiesce in one's working conditions.[22] This factor weighs in favor of a borrowed employee finding.

---

[19] *Id.*
[20] Billizon v. Conoco, Inc., 993 F.2d 104, 106 (5th Cir. 1993).
[21] *Brown*, 984 F.2d at 678.
[22] *See id.*; Magnon v. Forest Oil Corp., No. 06-0587, 2007 WL 2736612, at *5 (W.D. La. Sept. 18, 2007) ("Four months is a reasonable period of time to observe the living and working conditions to which plaintiff would be exposed.").

**E. Termination of Relationship**

"It is well-settled [that] a finding of borrowed employee status does not require that the lending employer completely sever its relation with the employee. The focus, instead, is on the lending employer's relationship with the employee while the borrowing occurs."[23] Defendants argues that Wood Group and QPS terminated their relationship with Villemarette, Mosley, and Trahan because they had little contact with the employees during their time on the platform. Plaintiff offers no evidence disputing this fact or showing a supervisory relationship between Wood Group/QPS and Villemarette, Mosley, or Trahan. Accordingly, this factor weighs in favor of a borrowed employee finding.

**F. Tools and Place**

Defendants argue that Fieldwood provided both the tools and place of performance, including vessel and helicopter transportation to the platform, food, accommodations, equipment, tools, and supplies. The only tools not provided by Fieldwood were Villemarette's personal protective gear and a few of Mosley's hand tools and a uniform. Mosley testified that if he needed additional parts to make repairs, Fieldwood provided them. Accordingly, this factor weighs in favor of a borrowed employee finding.

**G. Length of Employment**

At the time of Mosley's accident, each of the employees had been working for Fieldwood for at least four months. "Where the length of employment is considerable, this factor supports a finding that the employee is a borrowed

---

[23] Robertson v. W & T Offshore, Inc., 712 F. Supp. 2d 515, 532 (W.D. La. 2010).

employee."[24] Courts have found this factor to be neutral where the length of employment was four months.[25]

**H. Right to Discharge**

The parties agree that Fieldwood had the right to have each employee removed from its platform. Plaintiff argues, however, that Fieldwood did not have the right to fire the employees from their positions with Wood Group or QPS. "[W]here the borrowing employer . . . has the right to terminate the borrowed employee's services with the borrowing employer, even though the borrowing employer does not have the right to terminate the borrowed employee's position with the nominal employer . . . , the right to discharge factor is satisfied."[26] Accordingly, because Fieldwood could remove Villemarette, Mosley, or Trahan from their positions on its platform, this factor weighs in favor of a borrowed employee finding.

**I. Obligation to Pay**

The Fifth Circuit has held that the determinative inquiry for this factor is which party furnishes the funds used to pay the employee.[27] Wood Group and QPS were responsible for paying Villemarette, Trahan, and Mosley, respectively, based on the number of hours that were approved by Fieldwood. Wood Group or QPS then billed Fieldwood for that amount, and therefore

---

[24] *Id.*
[25] *Billizon*, 993 F.2d at 106; Vincent v. Fieldwood Energy, L.L.C., No. 14-2885, 2015 WL 6758269, at *5 (E.D. La. Nov. 5, 2015) ("Here, Vincent worked for Fieldwood for four months. The Court finds that this factor is neutral.").

[26] *Robertson*, 712 F. Supp. 2d at 534; *see Melancon*, 834 F.2d at 1246.
[27] *Melancon*, 834 F.2d at 1246.

Fieldwood ultimately provided the funds by which each employee was paid. Accordingly, this factor weighs in favor of a borrowed employee finding.

Despite the issue of fact regarding the MSCs, each factor weighs heavily in favor of a finding that Villemarette, Mosley, and Trahan were the borrowed employees of Fieldwood. Accordingly, this Court finds that the "[t]he reality at the worksite and the parties' actions in carrying out a contract" have impliedly modified the provisions of the MSCs attempting to prevent a borrowed employee finding.[28] Such a finding is appropriate here where "the remaining factors clearly point to borrowed-employee status."[29] Accordingly, Villemarette, Mosley, and Trahan are the borrowed employees of Fieldwood. Mosley cannot therefore succeed in a negligence action against his borrowed employer pursuant to the LHWCA, and the tort claims against Fieldwood are dismissed.

In addition, Wood Group contends that if Trahan, Villemarette, and Mosley are all borrowed employees of Fieldwood, then the LHWCA prohibits Mosley from bringing an action against his co-employees Trahan or Villemarette.[30] It argues that he is therefore also barred from bringing a claim of vicarious liability against Wood Group for their negligence.[31] Indeed, "[Plaintiff] cannot assert against [his co-employee's nominal employer], his non-existent right against [his co-employee]."[32] Plaintiff's claims against Wood Group for the vicarious liability of Villemarette and Trahan are dismissed.

---

[28] *Id.*
[29] *Billizon*, 993 F.2d at 106.
[30] 33 U.S.C. § 933(i).
[31] Wood Group also argues that it cannot be vicariously liable for Villemarette and Trahan if they are the borrowed employees of Fieldwood.
[32] Perron v. Bell Maint. & Fabricators, Inc., 970 F.2d 1409, 1413 (5th Cir. 1992).

13

## II. Linear Control's Motion for Summary Judgment

Finally, Linear Controls alleges that the claims against it should be dismissed because Plaintiff cannot show that it caused the accident. It argues that it cannot be liable for Plaintiff's slip and fall because (1) Trahan's negligence was a superseding cause, and (2) the hazard was open and obvious. This Court finds Linear Controls' first argument compelling. As Linear Controls argues, even if it acted negligently, Trahan's negligence in opening the spigot and letting fluid pour onto the deck was a separate, independent, intervening act.

Indeed, the evidence shows that Plaintiff slipped in hydraulic fluid that had leaked from a transformer that had been disconnected and moved by Linear Controls the day before. The transformer was not leaking before the move but began leaking at some point either during or after the move. The leak was initially contained by a bucket. Thereafter, Trahan opened the spigot on the transformer and allowed hydraulic fluid to run out onto the deck. He then attempted to wash it into a sump drain with a water hose. Trahan was reprimanded and instructed to clean the area with soap. The next morning, Plaintiff slipped and fell while walking through the area. Plaintiff testified at his deposition that the first time he saw fluid on the deck was after Trahan had opened the spigot. Although he suggests in his opposition to Linear Controls' motion that Trahan "did not necessarily introduce all of the oil to the deck." He does not provide any evidence suggesting that there was oil on the deck prior to Trahan opening the spigot.

"An intervening cause is one which comes into play after the defendant's negligent conduct has ceased, but before the plaintiff suffers injury."[33] Unless the intervening cause was foreseeable, it "will relieve the original tortfeasor of liability if it superceded the original negligence and alone produced the injury."[34] Here, even if Linear Controls was negligent in causing the transformer to leak, Mosley would not have been injured without Trahan's intervening negligence. Linear Controls certainly could not have foreseen that someone would remove the bucket and allow hydraulic fluid to leak on to the deck. Accordingly, Plaintiff cannot succeed on his claim of negligence against Linear Controls.

## CONCLUSION

For the foregoing reasons, the Motion are GRANTED, and Plaintiff's claims against all defendants are DISMISSED WITH PREJUDICE. Defendants are entitled to judgment in their favor.

New Orleans, Louisiana this 3rd day of October, 2017.

_____
**JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE**

---

[33] Vince v. Koontz, 213 So. 3d 448, 457 (La. App. 5 Cir. 2017).
[34] Jones v. Centerpoint Energy Entex, 66 So. 3d 539, 549–50 (La. App. 3 Cir. 2011).